**INTERNATIONAL BUSINESS MACHINES CORPORATION,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 95–828T.

United States Court of Federal Claims.

Aug. 8, 1997.

Reeves C. Westbrook, Washington, DC, for plaintiff.  Newman T. Halvorson, Jr., and Benjamin Y. Lieber, Covington & Burling, of counsel.

Stuart J. Bassin, Washington, DC, with whom was Assistant Attorney General Loretta C. Argrett, for defendant.  Mildred L. Seidman, Chief, Court of Federal Claims Section, Tax Division, and Grace L. Perez–Navarro, Special Counsel (International), Internal Revenue Service of counsel.

## OPINION

MILLER, Judge.

This case is before the court after argument and supplemental briefing on plaintiff's motion for partial summary judgment.  International Business Machines Corporation ("IBM" or "plaintiff") sues for the refund of income tax paid for tax years 1982–84.  Plaintiff takes the position that it is entitled to a foreign tax credit for its payment of an Italian tax on income produced in Italy.  The issue to be decided is whether the Italian tax was a compulsory payment with the predominant character of an income tax or in lieu of an income tax, thus entitling plaintiff to a foreign tax credit pursuant to 26 U.S.C. ("I.R.C.") §§ 901, 903 (1994).

## FACTS

Plaintiff was the American common parent of an affiliated group of corporations that filed consolidated federal income tax returns.  During 1982–84 IBM World Trade Corporation ("WTC"), one of plaintiff's American subsidiaries, received royalties from IBM Italia S.p.A. ("IBM Italy"), another member of plaintiff's affiliated group, under a licensing arrangement permitting IBM Italy to use certain IBM intellectual property.  The royalty payments totaled 190,319,967,000 lire for 1982;  192,633,961,000 lire for 1983;  and 261,285,954,000 lire for 1984.

Plaintiff paid an Italian corporate tax, L'Imposta Locale Sui Redditi ("ILOR"), on the income WTC received from IBM Italy.  Italy imposed ILOR on all income produced in Italy.  Italian Presidential Decree no. 599 of September 29, 1993, as amended, art. 1 (hereinafter "ILOR Decree").  For purposes of calculating a corporation's tax liability, Italian tax law divided corporations into

three categories: 1) resident corporations, 2) nonresident corporations with a permanent establishment, and 3) nonresident corporations without a permanent establishment. Having no office or other fixed place of business in Italy, WTC was a nonresident corporation without a permanent establishment for purposes of Italian tax law.

One of the major issues in the case at bar is whether WTC was required to pay ILOR on the royalties received from IBM Italy. The ILOR statute, prior to certain 1980 amendments, did not provide a clear answer. The uncertainty turned on whether royalties constituted "income from independent work" or "business income." If the royalties constituted income from independent work, ILOR applied to the royalties. If, on the other hand, the royalties constituted business income, ILOR did not apply. The Court of Cassation, Italy's highest court, resolved the uncertainty in favor of taxpayers, finding that royalties paid to nonresidents constituted business income and were not subject to ILOR. *See ITT v. Finanze*, Court of Cassation, Decision No. 7184 (Nov. 30, 1983) (unified section).

In December 1980 Italy enacted legislation revising the tax treatment of royalties paid to nonresident corporations without a permanent establishment.[1] *See* Italian Presidential Decree no. 597 of September 29, 1973, as amended, art. 19 (hereinafter "IRPEF"). The legislation provided that royalties paid to nonresident corporations constituted income produced within Italy, and thus income subject to ILOR, regardless of whether the royalties were considered business income or income from independent work. The legislation eliminated a nonresident corporate taxpayer's ability to rely on *ITT v. Finanze* to escape liability for ILOR.

The revised ILOR statute allowed several exemptions, including an exemption for income subject to a final withholding tax.

ILOR Decree, art. 1. Italy, in 1982, introduced a new withholding tax specifically applicable to royalties paid to nonresident corporations without a permanent establishment. Presidential Decree no. 897 of December 30, 1980, art. 43. WTC, however, was not required to pay the withholding tax due to a 1955 tax treaty between the United States and Italy—the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion, Mar. 30, 1955, U.S.-Italy, 7 U.S.T. 2999 (the "1955 Treaty").

1. *Plaintiff's interpretation of ILOR and plaintiff's refund suits*

Unsure of whether its royalty income was subject to the revised ILOR statute, plaintiff sought advice from its local tax advisor, Professor Bruno Giussani, a tax specialist at the Italian firm Studio Giussani, whom plaintiff has retained since 1979 to render advice on tax liability in Italy. Declaration of Bruno Giussani, Aug. 5, 1996, ¶ 1 ("Giussani Decl."). He advised plaintiff that the Italian Ministry of Finance (the "Finance Ministry") had taken the position that royalties exempt from the new withholding tax by virtue of a tax treaty would be subject to other applicable Italian taxes, including ILOR. Professor Giussani also advised plaintiff that it could make an untested, theoretical argument against the application of ILOR, namely that plaintiff was subject to a final withholding tax even though the 1955 Treaty did not require plaintiff to pay the withholding tax. According to Professor Giussani, the theoretical argument was a "near certain loser." Giussani Decl. ¶ 11.

After considering Professor Giussani's advice, plaintiff paid ILOR in the following amounts: 21,582,285,000 lire for 1982; 21,844,691,000 lire for 1983; and 29,629,827,000 lire for 1984.[2] Plaintiff subsequently filed

---

1. The legislation took effect on January 1, 1982.

2. In its Statement of Genuine Issues, defendant contends that plaintiff failed to attach a certified translation of its foreign tax return or original receipt, as required by Treas. Reg. § 1.905-2(a)(2)(1983), and that plaintiff therefore cannot not prove that it had paid ILOR. Def's Statement of Genuine Issues filed Mar. 21, 1997, No. 15.

Plaintiff, in its reply, alerted the court that the Internal Revenue Service (the "IRS") suspended all but the first sentence of Treas. Reg. § 1.905-2(a)(2). Plf's Reply to Def's Statement of Genuine Issues filed Apr. 14, 1997, at 15.2 (citing Notice 88–65, 1988–1 C.B. 552). During oral argument defendant withdrew this contention. *See* Transcript of Proceedings, *International Business Ma-*

legal actions seeking the refund of the ILOR payments from the Italian tax authorities, arguing that its royalty income was subject to the 1982 withholding tax.[3] For tax year 1982, plaintiff won at the first and second level tax commissions, and the Italian Government at present is appealing to the Central Tax Commission. For tax year 1983, plaintiff lost at the first level tax commission, won at the second level, and the Italian Government at present is appealing to the Central Tax Commission. For tax year 1984, IBM lost at the first level and has appealed to the second level.[4]

The Central Tax Commission has decided at least four other tax refund suits concerning the question of whether corporations in plaintiff's position are subject to ILOR. The Central Tax Commission ruled that ILOR applied in every case but one. Likewise, the Court of Cassation has ruled that ILOR applies to corporations in plaintiff's position. *See RCA v. Finanze*, Court of Cassation, Decision No. 3637 (Mar. 26, 1993); *Pilkington Brothers v. Finanze*, Court of Cassation, Decision No. 4301 (Apr. 8, 1992). These decisions have no precedential value.

### 2. *History of the instant litigation*

Plaintiff claimed a foreign tax credit for its payment of ILOR on its 1982–84 consolidated federal income tax returns. After reviewing plaintiff's returns, the Internal Revenue Service (the "IRS") issued a 30–day letter proposing to disallow the ILOR related foreign tax credit. The 30–day letter also addressed several other issues relating to plaintiff's tax return. *See infra* p. 665–666. Plaintiff filed

an administrative appeal regarding the proposed disallowance of the ILOR foreign tax credits and other proposed disallowances. The IRS formally disallowed the ILOR foreign tax credits by Notice of Partial Disallowance dated December 23, 1993. Plaintiff filed claims for refund on or about June 29, 1994, arguing, among other contentions, that the IRS improperly had disallowed the ILOR tax credits. The IRS to date has not allowed any part of the 1994 claims for refund. Plaintiff filed suit in the Court of Federal Claims on December 15, 1995, more than six months after filing the 1994 claims for refund.

Over defendant's protestations that the matter was not ripe for summary judgment, plaintiff filed its motion for partial summary judgment on August 20, 1996.[5] Defendant sought an enlargement of time requesting 112 days, or until December 31, 1996, within which to conduct discovery, and 120 days thereafter, or until April 30, 1997, within which to respond to plaintiff's motion for partial summary judgment. Defendant did not submit an affidavit pursuant to RCFC 56(g) with its motion. Plaintiff opposed defendant's motion for an extension of time and filed a motion to suspend discovery pursuant to RCFC 12(i). The court ruled that defendant had failed to prove its need for discovery in order to oppose plaintiff's motion for partial summary judgment. Nonetheless, the court granted defendant's motion for an enlargement of time in part, granting defendant until December 19, 1996, to conduct discovery and until February 28, 1997, to respond to plaintiff's motion for partial sum-

chines Corp. v. United States, No. 95–828T, at 122–23 (Fed.Cl. May 28, 1997).

3. One of defendant's experts on Italian law provided the following background facts about the Italian judicial system. *See* Opinion Letter dated Mar. 17, 1997, at 8–9 (attached to Declaration of Avv. Loretta Malintoppi, Mar. 17, 1997). Italian tax cases, during the years at issue, were heard by the special jurisdiction of tax commissions. Litigants commenced litigation before a local commission of first instance, could appeal to a local commission of second instance, and then appeal to the Central Commission located in Rome. The commissions of first and second instance and the Central Commission heard cases *de novo*. From the Central Commission, the

losing party could appeal to the Court of Cassation. The Court of Cassation, which consisted of nine judges, heard appeals in five-judge panels except when the full court convened in a "united section." The Court of Cassation's scope of review was limited to questions of law.

4. The different results reached by the Italian tax commission reflect the fact that Italy, as a civil law country, does not recognize the principle of *stare decisis*. *See infra* at 673–674.

5. The parties' vigorous disputes about the timing of subsequent filings are noted only because the court gave defendant all the time and latitude in framing its response to plaintiff's motion that defendant could justify.

mary judgment. *See International Business Machines Corp. v. United States*, No. 95–828T, at 4 (Fed.Cl. Oct. 10, 1996). After a second motion for an extension of time, the court extended the date of defendant's response to March 21, 1997. *See International Business Machines Corp. v. United States*, No. 95–828T, at 1 (Fed.Cl. Mar. 12, 1997).

## DISCUSSION

### I. *Summary judgment standard*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Seal–Flex, Inc. v. Athletic Track and Court Const.*, 98 F.3d 1318, 1321 (Fed.Cir.1996) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986)). The moving party bears the initial burden of establishing the absence of any disputes of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). "When the movant has met its initial burden, the non-movant must respond with sufficient evidence to show that there is a material factual dispute and that, on the non-movant's evidence, the movant is not entitled to judgment as a matter of law." *Id.*

When resolving a motion for summary judgment, the court cannot weigh the evidence and determine the truth of the matter. *Anderson*, 477 U.S. at 249, 255, 106 S.Ct. at 2510–11, 2513–14. Any evidence presented by the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513–14. Accordingly, in its capacity as the opponent of summary judgment, defendant is entitled to "all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984).

The judge's role in the summary judgment process is to determine "whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. A dispute is material if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510. A dispute is genuine if it "reasonably may be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511. The non-movant cannot satisfy this burden with mere allegations of counsel or general denials: " 'The nonmoving party (must) go beyond the pleading and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.' " *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1560–61 (Fed.Cir.1995) (quoting *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553–54) (internal quotations omitted); *see* RCFC 56(f); *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 835–36 (Fed.Cir.1984); *Octocom Sys., Inc. v. Houston Computer Servs., Inc.*, 918 F.2d 937, 940 (Fed.Cir.1990); *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987); *Chemical Eng'g Corp. v. Essef Indus., Inc.*, 795 F.2d 1565, 1571 (Fed.Cir. 1986).

The Supreme Court has emphasized that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut but, rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1). Even before the Supreme Court's trio of 1986 decisions that recognized and strengthened summary judgment as a favored tool for adjudicating the merits of disputes, a prominent treatise advised that courts should not deny a motion for summary judgment simply because resolution of the motion involves difficult questions of law:

> The fact that difficult questions of law exist is not in and of itself a ground for denying summary judgment in as much as refusing to grant the motion does not obviate the court's obligation to make a difficult decision; a denial merely postpones coming to grips with the problem at the cost of en-

gaging in a full-dress trial that is unnecessary for a just adjudication of the dispute. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2725 (2d ed.1983) (citing *Sagers v. Yellow Freight Sys., Inc.*, 529 F.2d 721 (5th Cir.1976); *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.1975); *Spark v. Catholic Univ. of Am.*, 510 F.2d 1277 (D.C.Cir.1975)).

## II. *Limitations on final judgments in tax refund cases*

■ Plaintiff's motion for partial summary judgment seeks a monetary award in the amount of $43,869,522.00, plus interest. Defendant argues that the court cannot enter a partial final judgment on plaintiff's motion because other issues in plaintiff's complaint remain unresolved. For example, plaintiff's complaint raises issues concerning foreign tax credits for taxes paid to Pakistan, Guatemala, Qatar, Canada, Germany, and France; additional capital loss deductions; and various net operating losses. In *Houston Indus. Inc. v. United States*, 78 F.3d 564, 568 (Fed.Cir.1996), the Federal Circuit held that all issues relating to a tax refund suit for a single tax year must be resolved prior to the entry of a final judgment:

> We are not persuaded that a ruling in a tax case on one but not all of the issues pertaining to a tax year can ever constitute a separate claim. Although the Supreme Court's opinion in *[C.I.R. v.] Sunnen [*333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948)*]* concerns the application of the doctrine of res judicata and is not directly on point, we cannot ignore the Court's instruction that each tax year is "the origin of a new liability and of a separate cause of action." *Sunnen*, 333 U.S. at 598, 68 S.Ct. at 719. We note that at least one other circuit has interpreted *Sunnen* to stand for the proposition that "[the] total income tax liability for each taxable year constitutes a single, unified cause of action, regardless of the variety of contested issues and points that may bear on the final computation." *Finley v. United States*, 612 F.2d 166, 170 (5th Cir.1980).

*Houston Indus.*, 78 F.3d at 568 (brackets in original). Defendant also argues that, even if *Houston* permitted the entry of a partial final judgment in a tax refund suit, plaintiff cannot prove that it falls within the foreign tax credit limitation of I.R.C. § 904 until the other issues alleged in plaintiff's complaint are resolved.[6] Def's Br. filed Mar. 21, 1997, at 13; *see infra* p. 668 for discussion of I.R.C. § 904.

Given the unresolved issues raised by plaintiff's complaint, the court cannot enter a monetary judgment in favor of plaintiff. However, *Houston* does not prohibit the court from ruling on the issue of liability and entering a final judgment at a later date once the other issues are resolved and plaintiff establishes that it satisfies the foreign tax credit limitation of I.R.C. § 904.

## III. *The applicable treasury regulations*

The IRS promulgated temporary regulations interpreting the statutory foreign tax credit provisions in 1980. *See* T.D. 7739, 1981–1 C.B. 396. The Secretary then superseded the temporary regulations with final regulations that took effect on November 14, 1983. *See* T.D. 7918, 1983–2 C.B. 113. The final regulations contain an elective provision permitting a taxpayer retroactively to apply the final regulations to tax years beginning before November 14, 1983. *See* Treas. Reg. § 1.901–2(h)(1)–(2). To trigger retroactive application of the final regulations, a taxpayer must "attach[ ] a statement to a return, amended return, or claim for refund for the earliest taxable year to which the election relates. Such statement shall state that the election is made and, unless the election is to apply to all foreign countries, the statement shall designate the election countries." *Id.* § 1.901–2(h)(2)(iii).

Plaintiff filed a statement of election pursuant to Treas. Reg. § 1.901–2(h)(2)(iii) with its 1983 tax return:

> Pursuant to the provisions of Internal Revenue Regulation Section 1.901–2(h)(2), International Business Machines Corporation, Armonk, New York 10504, the common parent of the affiliated group filing

---

**6.** Plaintiff, in its reply brief, agreed that the court cannot enter a partial final judgment in the case at bar. *See* Plf's Br. filed Apr. 14, 1997, at 3 n. 2.

this Consolidated Income Tax Return, hereby elects for itself and for each member of the affiliated group to apply the provisions of Regulation Section 1.901–2, Regulation 1.902–2A and Regulation Section 1.903–1 to all taxable years beginning on or before November 14, 1983 which remain open. Such election shall apply to all Foreign Countries.

■ Plaintiff argues that because the election was attached to its 1983 tax return, it applies to 1983 and all subsequent years. While conceding that the election was not attached to plaintiff's 1982 tax return, defendant urges the court to find that the election applies to tax year 1982 based on the doctrine of substantial compliance. Defendant directs the court's attention to an opinion by the United States Court of Appeals for the Tenth Circuit, *Woodbury v. Commissioner*, 900 F.2d 1457 (10th Cir.1990):

> Petitioners have no support for their implicit contention that the "must" and "shall" language necessitates literal compliance with the requirements for an election. It is well established that in determining whether an election has properly been made absent adherence to literal requirements, a court should assess whether the taxpayer has substantially complied with the requirements, not withstanding the "shall" and "must" language.
>
> In assessing substantial compliance, a court must ask whether the requirements are mandatory in nature, or merely procedural details established to facilitate the Commissioner's administration of the Internal Revenue Code.

*Id.* at 1460 (citations omitted).

The Federal Circuit has taken a much narrower view of the substantial compliance doctrine than the Tenth Circuit. In *Credit Life Ins. Co. v. United States*, 948 F.2d 723 (Fed.Cir.1991), the Federal Circuit explained:

> "Reading the Tax Court's decisions on the subject of substantial compliance is enough to make one's head swim. Tax lawyers can have no confidence concerning the circumstances in which non-compliance with regulations governing the election of favorable tax treatment will or will not work a forfeiture. The result has been a surge of

unnecessary litigation well illustrated by the present suit. We think the doctrine should be interpreted narrowly, and point out that the courts of appeals owe no special deference to the Tax Court's legal views.... The common law doctrine of substantial compliance should not be allowed to spread beyond cases in which the taxpayer has a good excuse (though not a legal justification) for failing to comply with either an unimportant requirement or one unclearly or confusingly stated in the regulations or the statute."

*Id.* (quoting *Prussner v. United States*, 896 F.2d 218, 224 (7th Cir.1990) (en banc)).

Treas. Reg. § 1.901–2(h)(2)(iii) contains a straightforward and precise requirement for triggering the retroactive application of the final regulations: The taxpayer must attach a statement of election to its tax return for the earliest year to which it desires the final regulations to apply. Whether or not a statement of election applies to a given tax year has important substantive consequences. *See Thomas Int'l Ltd. v. United States*, 773 F.2d 300, 305 (Fed.Cir.1985) (holding that regulation requiring that commissions receivable be paid within 60 days after end of DISC's taxable year in order to constitute qualified export assets was substantive requirement that must be complied with literally). If the election is made, the final regulations will apply to tax years prior to their official effective date. Consequently, the facts of the case at bar do not warrant application of the doctrine of substantial compliance. The temporary regulations apply to the 1982 tax year, and the final regulations apply to the 1983–84 tax years.

## IV. *The foreign tax credit*

The foreign tax credit provisions of the Internal Revenue Code (the "Code") protect against the double taxation of foreign income. *See United States v. Goodyear Tire & Rubber Co.*, 493 U.S. 132, 139, 110 S.Ct. 462, 467–68, 107 L.Ed.2d 449 (1989); *American Chicle Co. v. United States*, 316 U.S. 450, 451, 62 S.Ct. 1144, 1144–45, 86 L.Ed. 1591 (1942). To this end I.R.C. § 901(b) permits a domestic corporation to receive a tax credit in "the

amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States." 26 I.R.C. § 901(b). I.R.C. § 903 expands the definition of "income, war profits, and excess profits taxes" to include "a tax paid in lieu of a tax on income, war profits, or excess profits otherwise generally imposed by any foreign country or by any possession of the United States." 26 I.R.C. § 903.

Although the Code provides for relief from double taxation, it also limits the foreign tax credit to "the same proportion of the tax against which such credit is taken which the taxpayer's taxable income from sources without the United States (but not in excess of the taxpayer's entire taxable income) bears to his entire taxable income for the same taxable year." 26 I.R.C. § 904. The I.R.C. § 904 limitation serves "to assure that the credit will be granted only against the United States tax applicable to the foreign income, and will not have the effect of offsetting the United States tax on United States income." *Schering Corp. v. Commissioner,* 69 T.C. 579, 590, 1978 WL 3378 (1978).

The temporary and final regulations provide detailed interpretations of the Code's foreign tax credit provisions. Treas. Reg. § 1.901–2(a)(1) contains a two-part test for determining whether a foreign levy is a creditable tax pursuant to I.R.C. § 901 or § 903. First, the foreign levy must be a tax. Second, the tax must have the predominant character of an income tax in the United States' sense or be a tax in lieu of an income tax.[7] The court discusses each part of the test in turn.

1. *Is the foreign levy a tax?*

Treas. Reg. § 1.901–2(a)(2)(i) defines a tax, as follows:

A foreign levy is a tax if it requires a compulsory payment pursuant to the authority of a foreign country to levy taxes.

A penalty, fine, interest, or similar obligation is not a tax, nor is a customs duty a tax. Whether a foreign levy requires a compulsory payment pursuant to a foreign country's authority to levy taxes is determined by principles of U.S. law and not by principles of law of the foreign country. Therefore, the assertion by a foreign country that a levy is pursuant to the foreign country's authority to levy taxes is not determinative that, under U.S. principles, it is pursuant thereto.

Treas. Reg. § 1.901–2(e)(5)(i) further defines a "compulsory payment":

An amount paid is not a compulsory payment, and thus is not an amount of tax paid, to the extent that the amount paid exceeds the amount of liability under foreign law for tax. An amount paid does not exceed the amount of such liability if the amount paid is determined by the taxpayer in a manner that is consistent with a reasonable interpretation and application of the substantive and procedural provisions of foreign law (including applicable tax treaties) in such a way as to reduce, over time, the taxpayer's reasonably expected liability under foreign law for tax, and if the taxpayer exhausts all effective and practical remedies, including invocation of competent authority procedures available under applicable tax treaties, to reduce, over time, the taxpayer's liability for foreign tax (including liability pursuant to a foreign tax audit adjustment) .... An interpretation or application of foreign law is not reasonable if there is actual notice or constructive notice (*e.g.,* a published court decision) to the taxpayer that the interpretation or application is likely to be erroneous. In interpreting foreign tax law, a taxpayer may generally rely on advice obtained in good faith from competent foreign tax advisors to whom the taxpayer has disclosed the relevant facts. A remedy is effective and practical only if the cost

---

7. The temporary regulations also employ this two-part framework. With regard to the first part, whether or not a foreign levy is a tax, the two sets of regulations are operatively identical, so the court analyzes all three years using the language of the final regulations. *See* Plf's Br. filed Aug. 20, 1996, at 11. n.9, 22 n.17; Def's Br. filed Mar. 21, 1997, at 21 n.18. With regard to the second part, whether or not a foreign levy has the predominant character of an income tax or is a tax in lieu of an income tax, the temporary and final regulations contain different requirements, so the court considers the 1982 and 1983–84 tax years separately as to this issue.

thereof (including the risk of offsetting or additional tax liability) is reasonable in light of the amount at issue and the likelihood of success.

The preceding definition of a tax contains three elements: 1) The taxpayer's determination that the payment does not exceed the amount of liability under foreign law must be based on an interpretation of foreign law; 2) the interpretation must be reasonable; and 3) the taxpayer must exhaust "all effective and practical remedies." *Id.* Plaintiff submits that it satisfies all three elements. According to plaintiff, it sought advice from Professor Giussani concerning its tax obligations under the revised statute. Professor Giussani explained to plaintiff that the Italian Ministry of Finance (the "Finance Ministry") had interpreted the revised ILOR statute to apply to nonresident corporations without permanent establishments similar to plaintiff. He advised plaintiff that it could contest the Finance Ministry's position by arguing that plaintiff fell within one of the statutory exemptions to ILOR, namely that plaintiff was subject to a final withholding tax. However, because the 1955 Treaty exempted plaintiff from the withholding tax, Professor Giussani predicted that such an argument would be "a near certain loser." Giussani Decl. ¶ 11. Professor Giussani thus advised plaintiff to pay ILOR and, if it so desired, sue for a refund. He cautioned plaintiff that its chances of succeeding with a refund suit were "remote." *Id.* ¶ 13. Despite Professor Giussani's pessimistic outlook, plaintiff filed for refunds and continues to litigate the issue in the Italian court system.

Defendant argues that numerous genuine issues of material fact exist concerning plaintiff's interpretation of the revised ILOR statute and exhaustion of remedies and that the court therefore must deny plaintiff's motion for partial summary judgment. Defendant's Statement of Genuine Issues raised objections to 42 of plaintiff's 54 proposed findings of uncontroverted fact. *See* Def's Statement of Genuine Issues filed Mar. 21, 1997. Plaintiff thereafter filed a reply, which attempted to show the deficiencies in defendant's arguments. *See* Plf's Reply To Def's Statement of Genuine Issues filed Apr. 14, 1997. De-fendant suggests that the filing of a reply *ipso facto* demonstrates the existence of genuine issues of material fact: "That IBM felt compelled to file a 100+ page Reply To Defendant's Statement of Genuine Issues—a document not contemplated by RCFC 56(d)—essentially proves the merit of defendant's arguments regarding the defects in the factual record." Def's Br. filed May 16, 1997, at 2. This argument is stunning in its implications.

■ The court agrees with defendant that plaintiff cannot prevail by showing that the weight of evidence favors its position if genuine issues of material fact are still present. If the court weighs the evidence, it commits error. However, plaintiff's reply to defendant's statement of genuine issues was appropriate because it attempted to point out why defendant failed to raise a genuine factual issue, not why its evidence was more probative than defendant's evidence. The fact that defendant raises 42 alleged genuine issues of material fact does not mandate denial of plaintiff's motion. "With respect to whether there is a genuine issue, the court may not simply accept a party's statement that a fact is challenged." *Barmag,* 731 F.2d at 835. The court must consider each of the factual disputes raised by defendant to determine whether defendant has identified a factual dispute that is both genuine and material. Defendant must proffer sufficient evidence establishing that a genuine factual conflict exists. *See* RCFC 56(f); *Octocom,* 918 F.2d at 940. If defendant succeeds in this regard, the court cannot resolve the factual conflicts and must deny plaintiff's motion. If, however, defendant does not meet its burden, the court may grant plaintiff's motion, despite defendant's protestations to the contrary.

■ In addition to raising a plethora of alleged factual disputes, defendant argues that the court should deny plaintiff's motion due to the large amount of money at stake in this case—over $100,000.00 when interest is attached—and the complexity of the regulations. Neither of these points should affect how the court reviews plaintiff's motion. It is beyond cavil that all litigants, no matter what the economic value of their cases, are

entitled to utilize the summary judgment procedure. Likewise, the complexity of the law at issue does not make a case less amenable to summary judgment.[8] *See* Wright *et al., supra,* at 7, § 2725.

1) *Facts concerning whether plaintiff interpreted the revised ILOR statute*

Defendant contends that plaintiff did not interpret the revised ILOR statute, but, rather, based its decision to pay the tax (or directed WTC to pay the tax) on an earlier interpretation of the original statute. Def's Statement of Genuine Issues filed Mar. 21, 1997, No. 38. In support of its position, defendant cites a portion of the deposition of Terence M. Gleeson, plaintiff's Director of Taxes International during the years at issue:

Q [By Defense Counsel]: In your recollection when was the decision first made to go ahead and file claims for refund for any year involving ILOR?

Mr. Halvorson: By "any year," Counsel, do you mean the years at issue in this case or beyond that?

Mr. Bassin: Beyond the issues in this case, beyond the years in suit.

. . . .

A [By Mr. Gleeson]: To the best of my recollection, it was in the late '79/early '80 time frame. The reason I say that is, apart from general recollection, is that on the 5th or the 10th, I guess, I'm not sure whether this is an American date, I guess it is, "Professor Giussani advised against litigation on the nontaxability of royalties under ILOR," so that issue was still open

at that stage and then subsequent to that a decision was made to file refund claims in Italy.

Q [By Defense Counsel]: Was there another period of time where that decision is revisited and the whole topic of whether or not we should be filing refund claims came up?

A [By Mr. Gleeson]: To the best of my recollection, no. Once that decision was made it was not revisited in terms of would we either not continue with the litigation.

Q [By Defense Counsel]: So when Italy changed its law effective for '82 there wasn't a concentrated reexamination of the question to decide whether or not IBM would continue to pay the tax and file refund claims?

A [By Mr. Gleeson]: No. It appears that the assumption was that having made that decision for the pre '82 years, we simply had decided that for the subsequent years since we had no option but to pay the tax we would file refund claims.

Deposition of Terence M. Gleeson, Dec. 6, 1996, at 193–94.

Defendant attempts to create a genuine issue of material fact by construing Mr. Gleeson's deposition testimony to state that plaintiff did not "revisit" the issue of its obligation to pay the ILOR tax after the ILOR amendment became effective. The plain language used by Mr. Gleeson does not support defendant's contention. Mr. Gleeson stated that plaintiff did not "revisit" the question of whether plaintiff should file refund suits for years subsequent to the ILOR revision. He did not testify that plaintiff did not revisit

---

**8.** The final and temporary regulations are extremely confusing. Even the author of the regulations has acknowledged this fact:

On October 6, 1983, after the issuance of three sets of proposed regulations over a four-year period, the Treasury Department issued its final regulations under Section 901 and 903 of the Internal Revenue Code of 1954 ("the Code"), thus bringing an era [of] peace, for the time being, to the foreign tax credit area. Most of the issues that were raised over the lifetime of the regulations project were resolved in the final regulations and thus taxpayers now have, for better or for worse, a reasonable degree of certainty in dealing with Sections 901 and 903.

They have that degree of certainty, however, only by entering the peculiar world of the final foreign tax credit regulations. For some taxpayers, entering this world may be like passing through Alice's looking glass. They encounter such strange entities as specific economic benefits and dual capacity taxpayers and a strange language that speaks of differences in kind and not in degree. They become disoriented by a maze of pathways that sometimes appear to take them right back to where they started. Herman B. Bouma, *The Final Foreign Tax Credit Regulations: Through the Looking Glass,* 62 Taxes 554 (1984). The regulations in this case should be Exhibit A to any proposed legislation to simplify the Code.

the issue of whether to pay ILOR. To the contrary, Mr. Gleeson later testified that plaintiff did receive advice from Professor Giussani interpreting the revised ILOR statute:

Q [By Mr. Halvorson]: Let me direct your attention to your testimony this morning in response to a question by Mr. Bassin to the effect of the efforts by the company to obtain advice over time on the obligation to pay ILOR taxes and, in particular, its question whether once ILOR taxes began to be paid there was thereafter a concentrated effort to revisit that issue. Do you recall that?

A [By Mr. Gleeson]: Yes, I do.

Q [By Mr. Halvorson]: Now, let me direct your attention to the change in the law effective as of January 1, 1982. You've testified to that, am I right?

A [By Mr. Gleeson]: Yes.

Q [By Mr. Halvorson]: And you are familiar with that change in the law?

A [By Mr. Gleeson]: Yes.

Q [By Mr. Halvorson]: Was it your impression that upon that change in the law beginning in 1982 was the company's obligation to pay ILOR more certain or less certain than it had been before the change in the law?

A [By Mr. Gleeson]: Clearly more certain.

Q [By Mr. Halvorson]: Now, in connection with that change in the law, did you have occasion to consult with Professor Giussani regarding the company's obligations to continue to pay ILOR and file returns?

A [By Mr. Gleeson]: Yes.

Q [By Mr. Halvorson]: And did you seek his advice regarding the company's position concerning the filing of returns and the payment of ILOR under the new law?

A [By Mr. Gleeson]: Yes.

Q [By Mr. Halvorson]: And did you obtain advice from Professor Giussani?

A [By Mr. Gleeson]: Yes.

*Id.* at 255–57.

The evidence of record is consistent with Mr. Gleeson's testimony and demonstrates that no conflict of fact exists. Plaintiff submitted a memorandum from Professor Giussani to Arthur Odell, an IBM international tax official in the United States, dated February 25, 1981, several months after Italy enacted legislation revising the ILOR statute. The memorandum states, in pertinent part:

It is my personal opinion that the new Italian decree n. 897 of 12/30/80 has created a completely new situation relative to the problem of the taxability in Italy of royalties paid to non resident Companies without a permanent establishment in Italy.

. . . .

At this point in time, it seems reasonable to hold that paragraph 5 of art. 19, which provides for taxability only in the case of a permanent establishment in Italy, remains effective for the past (up to December 31, 1981). For the future, it is necessary only to refer to the residence in Italy of the payer of royalties.

Defendant has misinterpreted the portion of Mr. Gleeson's testimony discussed above. The testimony simply does not say what defendant argues. If defendant could point to a specific part of the record to raise a factual issue as to whether plaintiff interpreted the ILOR statute, the court would have no choice but to deny plaintiff's motion. However, defendant has not made this essential showing. The court is left with uncontroverted evidence that plaintiff based its decision to pay ILOR on an interpretation of the revised ILOR statute. Without evidence to support its position, defendant's argument that plaintiff did not interpret the revised ILOR statute amounts to nothing more than argument of counsel. The court premises this finding on the declarations and documentary evidence submitted by plaintiff and the complete absence of evidence supporting defendant's position, not on a weighing of the evidence.

Defendant next argues that even if plaintiff interpreted the revised ILOR statute, plaintiff did not believe that it was liable for ILOR. Defendant directs the court's attention to a limited portion of a January 1, 1986 letter from Professor Giussani to Mr. Gleeson: "In my opinion, in the new situation too,

non-resident companies should not be obliged to pay ILOR if they do not operate in Italy through a permanent organization." Standing alone, the quoted passage appears to create a factual conflict. The apparent conflict disappears when one reads the preceding paragraph, which defendant failed to quote: "As to the new tax regulations, that came into force on 1.1.1982, it is necessary to follow the relative instructions, i.e. present tax returns, *pay the tax* and start the refund procedure, and this results in a case being brought before the Tax Commissions." *Id.* at 702 (emphasis added)

Professor Giussani's January 1, 1986 letter unquestionably advised plaintiff that it had to pay ILOR. The portion of the letter cited by defendant, when read in context, does not advise against paying ILOR; rather, it informs plaintiff of a potential legal argument to be used in a refund suit. Professor Giussani's deposition testimony further clarifies the meaning of his letter to Mr. Gleeson:

Q [Defense Counsel]: The paragraph numbered 11 [of Professor Giussani's declaration ], the last sentence. It says: "I advised IBM, however, that as a basis for contesting ILOR in the Italian courts this position was a near certain loser". Can you reconcile that statement in your ... [declaration] with the statement in exhibit 81, the letter of January 28, 1986?

. . . .

A [Professor Giussani]: In the letter—I no longer have it—I express the opinion that one can affirm, maintain, the non-taxability of the royalties in Italy. This is my opinion. Here [in the declaration] I am saying something different. Here I am saying what can be the outcome of a contestation. In the letter I did not speak about the possibility of the final outcome of the litigation. Here [in the declaration] I said: Look, this appears on the one hand a

firmness in theory but, according to me, my opinion, it will certainly be lost.

Giussani Dep., Jan. 24, 1997, at 127.

Defendant once again attempts to create a genuine issue of material fact—not by offering evidence of its own—but by attempting to identify an inconsistency in the testimony of one of plaintiff's witnesses. When, however, one views the alleged inconsistency in context, it becomes clear that plaintiff's witnesses are perfectly consistent.

Defendant also argues that plaintiff's decision to pay ILOR was based on its desire to preserve favorable relations with the Italian Government and not on its interpretation of the revised ILOR statute. In particular, defendant contends that WTC was concerned about the nature of its royalty agreements and its status as a nonresident corporation without a permanent establishment.[9] Defendant focuses on a portion of Professor Giussani's May 31, 1979 letter to Mr. Annibali, which counsels against suing for a refund of pre–1979 ILOR payments:

A lawsuit brings as a direct consequence the need to demonstrate in the Courts, year by year, the amount of royalties, with the possibility of resulting appraisals and evaluations of any kind, with regard to their size in absolute and relative terms, and in comparison with other companies, there is also the possibility that this subject might be caught by the press more easily, and they might take the matter up and handle it in a demagogical and distorted manner.

Defendant's evidence does not raise a genuine issue of material fact. The case at bar involves plaintiff's payment of ILOR for the 1982–84 tax years—years which were governed by the revised ILOR statute. The opinions of plaintiff's corporate officers, tax advisors, and legal counsel put forward by defendant concern earlier tax years, which were governed by the former ILOR statute. Consequently, these earlier opinions cannot

---

**9.** Plaintiff inadvertently produced Avv. Yorick Spolidoro's opinion letter to defendant in response to defendant's discovery request. Plaintiff filed a motion for a protective order seeking the return of the opinion letter, along with three other inadvertently disclosed documents. The court denied plaintiff's motion, finding that plaintiff had failed to demonstrate adequately the steps it took to prevent inadvertent disclosure. *See International Business Machines Corp. v. United States,* 37 Fed.Cl. 599 (1997) (order denying motion for protective order).

raise a genuine issue of material fact regarding plaintiff's decisions for the 1982–84 tax years. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510 ("Factual disputes that are irrelevant or unnecessary will not be counted."). Additionally, although the pre–1982 opinions discuss whether filing refund claims against the Italian Government would be politically prudent, defendant offers no evidence that political considerations influenced plaintiff's initial decision to pay the ILOR tax. Once again, defendant has not met is burden of bringing forth competent evidence to support its proposition.

2) *The reasonableness of plaintiff's interpretation of revised ILOR statute*

Treas. Reg. § 1.901–2(e)(5)(i) requires that a taxpayer's interpretation of foreign law be "consistent with a reasonable interpretation and application of the substantive and procedural provisions of foreign law (including applicable tax treaties) in such a way as to reduce, over time, the taxpayer's reasonably expected liability under foreign law for tax, . . ." The regulation permits the taxpayer to rely "in good faith" on the advice of a "competent foreign tax advisor[ ]." *Id.* Interestingly, defendant does not challenge Professor Giussani's competence or the reasonableness of his advice. As previously discussed, Professor Giussani advised plaintiff that the Finance Ministry had interpreted the revised ILOR statute to apply to taxpayers in plaintiff's position and that, although plaintiff could make a theoretical argument against the application of ILOR, such an argument was a "near certain loser" in the Italian courts.

Professors Giuseppe Marino and Victor Uckmar, two of defendant's experts on Italian tax law, submitted a joint opinion letter that parallels the advice given to plaintiff by Professor Giussani:

> As illustrated above, from a legal point of view, ILOR was not due by WTC on royalties paid, as of January 1st, 1982, by IBM Italia: the condition to benefit of the exemption from ILOR, indeed, is met where such royalties are subject to a general tax regime prescribing the application of a final withholding tax, regardless of whether the withholding tax is effectively levied. *However, such interpretation is not followed by Italian Tax Authorities and by the majority of Italian Tax courts.* In particular, in 1981 the Italian Ministry of Finance stated that the entitlement to the exemption from ILOR only arises where the withholding tax on royalties has been effectively levied (Circular of December 12, 1981, no. 42/12/1587, in *DIR. Prat. Trib.* 1982, I, 129). The same conclusion, namely the necessity to a concrete subjection to the withholding tax in order to benefit of the exemption from ILOR, has been held by the prevailing decision of the Italian Tax Courts, including the Court of Cassation (such as Court of Cassation decision no. 4301, of April 8, 1992, in *Dir. Prat. Trib.,* 1993, II, 159; decision no. 3637, of March 26, 1993, in *Dir. Prat. Trib.,* 1993, II, 821).

> . . . .

> However, the issue cannot be considered solved at the present time. From a *present perspective,* it must be pointed out that the Joint *Sections of the Court of Cassation* have not ruled yet on the application of ILOR to royalty payments: on that basis, a relevant *change in the interpretation* of the tax provisions, *determining an ILOR exemption, cannot be excluded.*

Joint Opinion Letter dated Mar. 18, 1997, ¶¶ 5, 8 (attached to Declarations of Professor Victor Uckmar and Giuseppe Marino, Mar. 18, 1997) (emphasis added in part). Plaintiff thus satisfied the second element of Treas. Reg. § 1.901–2(e)(5)(i), namely that it relied in good faith on a reasonable interpretation of Italian law provided by a competent Italian tax advisor.

3) *Plaintiff's exhaustion of remedies*

■ The third element of Treas. Reg. § 1.901–2(e)(5)(i) requires the taxpayer to "exhaust [ ] all effective and practical remedies, including invocation of competent authority procedures available under applicable tax treaties, . . ." Defendant contends that plaintiff has not exhausted all "effective and practical remedies." First, defendant argues that plaintiff failed to invoke competent authority procedures under the 1955 Treaty.

ILOR, however, was not covered by the 1955 Treaty,[10] and therefore no competent authority procedure was available to plaintiff.

Second, defendant argues that plaintiff is not entitled to a foreign tax credit until the Joint Section of the Court of Cassation decides its refund cases. Defendant's opposition brief attacks plaintiff for what defendant views as an "unsupported, incorrect, and parochial assumption that the Italian legal system operates in the same way as the American system—which would treat the opinion of the United States Supreme Court on an issue of statutory construction as dispositive." Def's Br. filed Mar. 21, 1997, at 16–17. To correct what it deems a fundamental misunderstanding by plaintiff, defendant submitted the opinion letters of Avv. Loretta Malintoppi and Professors Victor Uckmar and Giuseppe Marino. These opinion letters assert that 1) Italy does not recognize the principle of *stare decisis* and 2) that the Court of Cassation has not ruled conclusively on the issue of whether ILOR applies to non-resident corporations without permanent establishments that would pay a withholding tax but for the existence of a tax treaty. *See* Opinion Letter dated Mar. 17, 1997, at 7 (attached to Declaration of Avv. Loretta Malintoppi, Mar. 17, 1997); Joint Opinion Letter dated Mar. 18, 1997, ¶ 8 (attached to Declarations of Professor Victor Uckmar and Giuseppe Marino, Mar. 18, 1997). Plaintiff does not dispute the testimony of defendant's experts. Plaintiff agrees with defendant that Italy does not recognize the principle of *stare decisis* and that the Court of Cassation has not resolved conclusively the issue of the applicability of ILOR to taxpayers in plaintiff's position. No genuine issues of material fact exist concerning these issues. Instead, the court must determine whether, given the absence of a conclusive answer by the Court of Cassation, ILOR qualifies as a creditable tax.

Defendant cites the exhaustion requirement of Treas. Reg. § 1.901–2(e)(5)(i) to support its argument. While the regulation itself does not provide a definition of "all effective and practical remedies," the IRS has provided guidance. In Rev. Rul. 70–290, a foreign government assessed an income tax on an American corporation. The corporation paid the tax and then filed a claim for overassessment with the foreign government. On the question of when the American corporation was entitled to a foreign tax credit, the Commissioner held:

> It is not the intention of the law to deprive the taxpayer of the right to obtain credit for foreign taxes because of the fact that the taxpayer contests the validity of the statute under which the amount of taxes were paid or because it protests the assessment and has made application for a refund. *The tax assessed constitutes a liability against the taxpayer. In the instant case such liability was met by actual cash disbursements. If the protest by the taxpayer against the original assessment prevails, any difference can readily be adjusted pursuant to the provisions of section 905(c) of the Code.*

Rev. Rul. 70–290, 1970–1 C.B. 160 (emphasis added).

Rev. Rul. 70–290 stands for the proposition that a taxpayer may claim a foreign tax credit for the year in which it pays the foreign tax, notwithstanding the fact that the taxpayer continues to contest its liability in the foreign country. Should the taxpayer ultimately receive a refund from the foreign government, the taxpayer must reimburse the Secretary for the amount originally credited pursuant to I.R.C. § 905(c). I.R.C. § 905(c) provides, in pertinent part:

> If accrued taxes when paid differ from the amounts claimed as credits by the taxpayer, or if any tax paid is refunded in whole or in part, the taxpayer shall notify the Secretary, who shall redetermine the amount of the tax for the year or years affected. The amount of tax due on such redetermination, if any, shall be paid by the taxpayer on notice and demand by the Secretary, or the amount of tax overpaid, if any, shall be credited or refunded to the taxpayer in accordance with the subchapter B of chapter 66 (sec. 6511 and following).

During argument the court questioned defense counsel about the applicability of Rev.

---

**10.** Defendant did not respond to plaintiff's contention on this point.

Rul. 70–290. Defense counsel responded that the revenue ruling was obsolete because it was issued prior to the effective date of both the temporary and final regulations. The court discovered that defense counsel's representation was incorrect. The preamble to the final regulations expressly states that Rev. Rul. 70–290 continues to represent the position of the IRS.[11] *See* T.D. 7918, 1983–2 C.B. 113, 115–16; *see also* Rev. Rul. 84–125, 1984–2 C.B. 125 (explaining that taxpayer is entitled to foreign tax credit upon payment of tax, despite fact that taxpayer contests liability).

"[A] revenue ruling is entitled to some weight as reflecting the Commissioner's interpretation of the regulation, but does not have the same force as a regulation." *Spang Indus., Inc. v. United States,* 791 F.2d 906, 913 (Fed.Cir.1986). Rev. Rul. 270–90 is entitled to additional weight due to the fact that it was expressly adopted by the drafters of the final regulations. *See* T.D. 7918, 1983–2 C.B. 113, 115. Nevertheless, defendant argues that public policy mandates a contrary result:

> In certain respects, IBM is just a stakeholder, in effect, in a conflict between the Italian [fisc] and the United States [fisc]. . . .

> Unfortunately, the United States can't litigate its claim in Italy. And what the regulations contemplate through the exhaustion of remedies requirement is that somebody look out for the United States' interest in this situation, that we—the foreign tax credit doesn't turn into nothing more than a subsidy to foreign governments, to foreign treasuries.

> What the exhaustion of remedies requirement does, and I think Mr. Halvorson quoted an article that said that the exhaustion of remedies requires people to act as if this really mattered to them, that it was their own money at tax [sic], not just foreign tax credit dollars.

> What the exhaustion of remedies requirement does is to push them to pursue the foreign litigation. If they had the interim credit and only had to exhaust practical remedies abroad, they'd have less incentive to aggressively represent, to aggressively pursue matters in a foreign country which is what we believe they should be required and the rules contemplate that they be required to do.

Transcript of Proceedings, *International Business Machines Corp. v. United States,* No. 95–828T, at 77–78 (Fed.Cl. May 28, 1997).

Although defendant presents sound policy reasons for requiring a taxpayer to exhaust all litigation remedies before being entitled to a foreign tax credit, the statute, the regulations, and the applicable revenue rulings do not reflect defendant's public policy concerns. The drafters of the final regulations could have specified that exhaustion of "all practical and effective litigation" meant exhaustion of all litigation, including the appellate process. The drafters did not do so and instead adopted Rev. Rul. 270–90. If the IRS considers that protection of the public fisc requires prohibiting foreign tax credits until the taxpayer exhausts its litigation remedies, the IRS should seek an amendment to the final regulations. That is a task for the Secretary of the Treasury, not this court. Consequently, the court finds that plaintiff has satisfied the exhaustion of remedies requirement of Treas. Reg. § 1.901–2(e)(5)(i).[12]

11. Plaintiff also brought the preamble of the final regulations to the court's attention. *See* Plf's Br. filed June 4, 1997, at 2. Defendant replied to plaintiff's notice of supplemental authority and conceded that Rev. Rul. 70–290 is not obsolete. *See* Def's Br. filed June 18, 1997, at 2. However, defendant continues to argue that plaintiff has not satisfied the exhaustion requirement of Treas. Reg. § 1.901–2(e)(5)(i): "It is now defendant's position that the Final Regulations, read in conjunction with the Preamble and Rev. Rul. 84–125, provide that payment of a contested foreign tax is an essential (but not sufficient) condition before a taxpayer may claim interim credits." Def's Br. filed June 18, 1992, at 2. According to

defendant, plaintiff, notwithstanding Rev. Rul. 70–290, must wait until litigation in Italy is complete before it is entitled to a foreign tax credit. Defendant's position controverts both Rev. Rul. 70–290 and Rev. Rul. 84–125. In both revenue rulings, the taxpayer was entitled to a foreign tax credit upon payment of the tax, notwithstanding the fact that the taxpayer was contesting liability.

12. In support of its argument concerning exhaustion of remedies, plaintiff also cited Treas. Reg. § 1.901–2(e)(2)(i), which provides, in pertinent part, that "an amount is not tax paid to a foreign country to the extent that it is reasonably certain that the amount will be refunded, credited, abat-

2. *Is the foreign levy an income tax or a tax in lieu of an income tax?*

A taxpayer must establish that the levy at issue is an income tax or a tax in lieu of an income tax. Treas. Reg. §§ 901, 903; Temp. Treas. Reg. §§ 901, 903. Plaintiff contends that ILOR qualifies 1) as either an income tax or a tax in lieu of an income tax under the temporary regulations and 2) as a tax in lieu of an income tax under the final regulations. Defendant counters that the court cannot decide this issue on summary judgment because the record lacks sufficient information about the structure of the Italian tax system.[13]

Because the issues are presented on plaintiff's motion for partial summary judgment, the court must examine how plaintiff attempts to discharge its burden of showing that it is entitled to judgment in its favor as a matter of fact and law. RCFC 56(c); *see Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12. Plaintiff does not produce opinion letters from Italian tax law experts; instead, it cites to pertinent provisions of the ILOR statute. In opposition defendant offers the opinion of Dott. Massimo Bagni, who provides an overview of the relationship between two taxes imposed on corporations: IRPEG, which is a national tax, and ILOR, which is a nationally collected local income tax. Dott. Bagni's opinion letter concludes:

> This opinion does not purport to be an exhaustive review of the issues treated above, but it provides a partial summary showing the complexity of the Italian tax system and the inter-relation existing between the different types of taxation. This opinion also shows the incompleteness and, in some cases, the errors, contained in IBM's presentation on Italian Law.

Opinion Letter dated Mar. 18, 1997, ¶ 36 (attached to Declaration of Massimo Bagni, Mar. 18, 1997). In order to determine whether plaintiff has discharged its burden or whether defendant has introduced a genu-

---

ed, or forgiven." Treas. Reg. § 1.901–2(e)(2)(ii) contains several examples demonstrating the proper application of section 1.901–2(e)(2)(i). Example (3) states:

> A computes his income tax liability in country X for the taxable year 1984 as 100u (units of country X currency), files a tax return on that basis, and pays 100u of tax. The day after A files that return, A files a claim for refund of 90u. The difference between the 100u of liability reflected in A's original return and the 10u of liability reflected in A's refund claim depends on whether a particular expenditure made by A is nondeductible or deductible, respectively. Based on an analysis of the country X tax law, A's country X tax advisors have advised A that it is not clear whether or not that expenditure is deductible. In view of the uncertainty as to the proper treatment of the item in question under country X tax law, no portion of the 100u paid by A is reasonably certain to be refunded. If A receives a refund, A must treat the refund as required by section 905(c) of the Internal Revenue Code.

Defendant contends that Treas. Reg. § 1.901–2(e)(2)(i)–(ii) is separate and distinct from Treas. Reg. § 1.901–2(e)(5)(i) and that the taxpayer therefore cannot use the former to interpret the exhaustion requirement of the latter. Defendant is correct that subsections 2(e)(2)(i) and 2(e)(5)(i) contain independent requirements, both of which must be satisfied before the taxpayer is entitled to a foreign tax credit. *See* T.D. 7918, 1982–C.B. 113, 115 ("Amounts of tax paid or accrued to a foreign country do not include amounts that are: (1) reasonably certain to be refunded, credited, rebated, abated, or forgiven, ... or (3) not compulsory payments."); Bouma, *supra* note 8, at 564 (explaining that Treas. Reg. § 1.901–2(e) contains a "battery" of "successive test[s]").

Defendant's argument, while technically correct, does not advance defendant's position that plaintiff is not entitled to a foreign tax credit. Defendant does not argue that plaintiff failed to satisfy Treas. Reg. § 1.901–2(e)(2)(i). Furthermore, plaintiff does not require Example (3) of Treas. Reg. § 1.901–2(e)(2)(ii) to support its proffered interpretation of Treas. Reg. § 1.901–2(e)(5).

Although the court does not employ Example (3) of Treas. Reg. § 1.901–2(e)(ii) to interpret Treas. Reg. § 1.901–2(e)(5), Example (3) appears to contradict defendant's interpretation of the exhaustion requirement of Treas. Reg. § 1.901–2(e)(5)(i). If the exhaustion meant exhaustion of all litigation, the taxpayer in Example (3) would not be entitled to a refund. whereas the example was given to illustrate circumstances entitling a taxpayer to a refund.

13. Temp. Treas. Reg. § 4.901–2(d) provides that "[w]hether separate charges are imposed by a foreign country depends upon the structure of foreign law." This provision is consistent with defendant's position that the court requires a full understanding of Italian tax law in order to determine the proper separate charge. Yet, the regulation itself proceeds to define what it means by "structure," *viz.*, charges under Treas. Reg. § 4.901–2(a) are separate if "separately computed" or if the foreign law contains "particular industry provisions."

ine issue of material fact, the court must rule whether reliance on the ILOR statute is sufficient authority or whether Dott. Bagni has pointed out any material discrepancy in plaintiff's analysis. At the outset it is important to note that Dott. Bagni never asserts that WTC was not liable for ILOR.

### 1) *The temporary regulations*

■ Temp. Treas. Reg. §§ 4.901, 903 contain detailed rules for determining whether a tax is an income tax or a tax in lieu of the income tax. Before applying these rules, the court must identify the proper tax to which the regulations apply. "Whether a charge imposed by a foreign country ('foreign charge') is an income tax [or a tax in lieu of an income tax] is determined independently for each separate foreign charge. Each separate foreign charge will be considered either to be an income tax or not to be an income tax [or a tax in lieu of an income tax], in its entirety, for all persons subject to the charge." Temp. Treas. Reg. § 4.901–2(a); *see id.* § 4.903–1(e)(4). Two commentators have described the purpose of the separate charge provision, as follows:

> Whether a tax is an income tax under § 901 or an in-lieu-of tax under § 903 is determined independently for each separate foreign levy.[14] To determine whether a tax satisfies § 901 or § 903, it is first necessary to determine what tax is in question—i.e., whether the tax at issue is a separate tax or is part of a broader tax. For example, if a U.S. investor has only interest income within a foreign jurisdiction and pays foreign tax only on that income, should the creditability criteria of § 901 or § 903 be applied to the tax on interest or to the income tax generally of the foreign country? The creditability of a foreign tax may turn on the resolution of this issue. A taxing provision that, standing by itself, would not impose a creditable tax nevertheless would be creditable if it is part of a unified tax that is an income tax.

D. Kevin Dolan & Carolyn M. DuPuy, *The Foreign Tax Credit–Overview and Creditability Issues,* 901 T.M. A–17 (1993).

Temp. Treas. Reg. § 4.901–2(d)(2) provides, in pertinent part:

> Foreign law imposes a separate charge on each separate base if a separate rate of charge is applied to each base or a flat rate is applied to bases that are combined. If a progressive rate of charge is applied to bases that are combined, foreign law imposes a single charge on the aggregate of the bases. A separate base may consist of a particular type of income (such as interest income or income derived by a particular class of persons) or nonincome amount (such as wages paid) identified by foreign law. Identified types of income or nonincome amounts constitute one base only if costs related to one type may reduce the other types. If no deduction for costs is permitted, each identified type of income or nonincome amount is a separate base, regardless of whether the types are aggregated for purposes of applying a rate of charge.

ILOR as applied to nonresident corporations without permanent establishments is a separate charge from ILOR as applied to resident corporations and nonresident corporations with a permanent establishment. *See* Temp. Treas. Reg. § 4.901–2(e), Example (29). While the former calculates the tax based on gross income, the latter calculates the tax based on net income. *See* ILOR Decree, art. 4; IRPEG, art. 22; IRPEF, arts. 19, 51; Bagni Op. Ltr. ¶¶ 12–35.

#### i) *Is ILOR an income tax?*

Having determined that ILOR as applied to nonresident corporations without permanent establishments is a separate charge, the court next determines whether ILOR is an income tax. A tax qualifies as an income tax if "(i) [t]he charge is not compensation for a specific economic benefit ...; (ii) [t]he charge is based on realized net income ...; and (iii) [t]he charge follows reasonable rules regarding source of income, residence, or other bases for taxing jurisdiction." Temp. Treas. Reg. § 4.901–2(a). The parties agree that ILOR as applied to nonresident corporations without permanent establishments is not compensation for a specific economic ben-

---

14. The final regulations replaced the term "sepa-   rate charge" with the term "separate levy."

efit. *See* Def's Statement of Genuine Issues filed Mar. 21, 1997, No. 42.

■ The temporary regulations provide a three-part definition of realized net income: "A foreign charge is computed on the basis of realized net income if and only if it meets the realization, gross receipts, and net income requirements as set forth in paragraph (c)(2), (3), and (4) of this section." Temp. Treas. Reg. § 4.901–2(c)(1). A foreign charge satisfies the realization requirement if the charge is imposed upon the occurrence of events that "[r]esult in the realization of income under the income tax provisions of the Internal Revenue Code." *Id.* § 4.901–2(c)(2). It is undisputed that ILOR as applied to nonresidents without permanent establishments satisfies the realization requirement. A foreign charge satisfies the second part of the definition of net realized income, the gross receipts requirement, if "it is imposed, without substantial deviation, on the basis of—(i) gross receipts...." Uncontroverted evidence establishes that ILOR as applied to nonresident corporations without permanent establishments is imposed on the basis of gross receipts. *See* Plf's Proposed Findings of Uncontroverted Fact filed Aug. 20, 1997, No. 30; Bagni Op. Ltr., ¶¶ 24–26.

The third part of the definition of net realized income provides, in pertinent part:

(4) Net income—(i) In general. A foreign charge meets the net income requirement if the base of the charge is computed, without substantial deviation, by reducing gross receipts by—

(a) Expenses and capital expenditures ("costs") attributable, under reasonable principles, to such gross receipts; or

(B) Costs computed under a *method* that is designed to produce an amount that is not less than costs attributable, under reasonable principles, *to* such gross receipts and that, in fact, produces an amount that approximates, or is *greater than, such costs, but only in the* case of transactions with respect to which it is reasonable to believe that

costs may not otherwise be clearly reflected.

Temp. Treas. Reg. § 4.901–2(c)(4)(i)(A)–(B).

ILOR as applied to nonresident corporations without permanent establishments does not satisfy the general definition of Temp. Treas. Reg. § 4.901–2(c)(4), because neither "expenses and capital expenditures" nor "costs" are subtracted from gross receipts when determining the base of the charge. However, the temporary regulations provide a limited exception to the general rule:

(iii) Charges on fixed or determinable income. Notwithstanding paragraph (c)(1) of this section, a foreign charge need not meet the net income requirement if and only if—

(A) It is imposed, without substantial deviation, on *items of gross income specified in* section 871(a) or 881(a) (or on such items of gross income reduced by specified amounts); and

(B) Foreign law makes a reasonable distinction, based on the degree of contact that the foreign country has with the recipient of the income or with the activities or assets that generate the income, between items of income that are subject to the charge and such items of income that are subject to a charge computed by reducing realized gross receipts by costs as described in paragraph (c)(4)(i) of this section.

*Id.* § 4.901–2(c)(4)(iii)(A)–(B).

Plaintiff argues that ILOR as applied to nonresident corporations without permanent establishments satisfies the exception to the general net income requirement. Royalties are items of income specified in I.R.C. §§ 871(a) and 881(a). *See* Treas. Reg. §§ 1.871–7(b), 1.881–2(b). Likewise, Italian law makes a reasonable distinction, "based on the degree of contact that the foreign country has with the recipient of the income," between items of income subject to a net income tax and items of income that are subject to a gross income tax. Only a nonresident company without a permanent establishment in Italy is subject to ILOR on a gross basis. *See* ILOR Decree, art. 4; IRPEG, art. 22; IRPEF, arts. 19, 51. This distinction comports with the distinction

drawn in Temp. Treas. Reg. § 4.901–2(e), Example (29).

Defendant does not dispute that I.R.C. §§ 871(a) and 881(a) impose a tax on royalties or that Italian law draws a reasonable distinction between items of income on which a gross versus a net tax is imposed. Defendant nonetheless contends that plaintiff has not proved that ILOR meets the net income requirement:

> Even if the temporary regulations applied for 1982, IBM's argument that ILOR, as applied to WTC, satisfies the net income test under Temp. Treas. Reg. Section 4.901–2(c)(4)(iii) must fail for lack of proof. The analysis requires proof that the net income computation under the foreign law reflects, at a minimum, costs properly attributable to that income or costs computed under a method designed to produce an amount not less than costs attributable to such gross receipts. ILOR does not allow deductions for WTC's actual costs and IBM has not presented any proof establishing that the statutory exemption was computed under the required method.

Def's Br. filed Mar. 21, 1997, at 28 n. 25 (citation omitted).

Defendant's argument is without merit. Defendant attempts to apply the general definition of net income, Temp. Treas. Reg. § 4.901–2(c)(4)(i)(A)–(B), to the exception for "charges on fixed or determinable income." *Id.* § 4.901–2(c)(4)(iii). However, Temp. Treas. Reg. § 4.901–2(c)(4)(iii) specifically provides that "[n]otwithstanding paragraph (c)(1) of this section, a foreign charge need not meet the net income requirement...." The proof that defendant argues is lacking pertains to the general net income requirement of Temp. Treas. Reg. § 4.901–2(c)(1), as defined in Temp. Treas. Reg. § 4.901–2(c)(4)(i). Thus, plaintiff need not satisfy the general definition of net income of Temp. Treas. Reg. § 4.901–2(c)(1) because plaintiff satisfies the exception provided in Temp. Treas. Reg. § 4.901–2(c)(4)(iii).

Plaintiff has established that ILOR as applied to nonresident corporations without permanent establishments is not compensation for a specific economic benefit and is based on realized net income, as defined in Temp. Treas. Reg. § 4.901–2(c)(4)(iii). Plaintiff must also prove that ILOR "follows reasonable rules regarding source of income, residence, or other bases for taxing jurisdiction." *Id.* § 4.901–2(a). "A foreign charge does not follow reasonable rules of taxing jurisdiction if liability for the charge is clearly related to the availability of a credit for the charge against income tax liability to another country." *Id.; see* Temp. Treas. Reg. § 4.901–2(e), Example (2). No indication is present that ILOR is related to a credit. Plaintiff so contends; defendant is silent. The record supports plaintiff's contention.

ILOR as applied to nonresident corporations without a permanent establishment is not compensation for an economic benefit, is based on realized net income, and follows reasonable rules for taxing jurisdiction. Consequently, the court finds that ILOR is an income tax under the temporary regulations.

### ii) *Is ILOR a tax in lieu of an income tax?*

I.R.C. § 903 provides that "the term 'income, war profits and excess profits taxes' shall include a tax paid in lieu of a tax on income, war profits, or excess profits otherwise generally imposed by any foreign country or by any possession of the United States." Because plaintiff has established that ILOR is an income tax, plaintiff need not prove that ILOR is a tax in lieu of an income tax in order to establish entitlement to a foreign tax credit for the 1982 tax year. However, the court, in order to provide a complete record, considers this alternative argument.

A foreign charge is a tax in lieu of an income tax if:

(1) The charge is not compensation for a specific economic benefit within the meaning of § 4.901–2(b);

(2) The charge meets the substitution requirement ...;

(3) The charge meets the comparability requirement ...; and

(4) The charge follows reasonable rules of taxing jurisdiction within the meaning of § 4.901–2(a)(1)(iii).

Temp. Treas. Reg. § 4.903–1(a).

Plaintiff already has established that ILOR is not compensation for a specific economic benefit and that ILOR follows reasonable rules of taxing jurisdiction. *See supra* pp. 678, 679–680. "A foreign charge meets the substitution requirement if the charge is clearly intended, and in fact operates, as a charge imposed in substitution for, and not in addition to, an income tax otherwise generally imposed." Temp. Treas. Reg. § 4.903–1(b). "An income tax is otherwise generally imposed if the country imposes an income tax or a series of separate income taxes (within the meaning of § 4.901–2) on significant amounts of income." *Id.* § 4.903–1(d). As explained *infra* pp. 680–681, plaintiff has not established that ILOR is in substitution for an income tax otherwise generally imposed. Thus, plaintiff's alternative argument—that ILOR qualifies as a creditable tax in lieu of an income tax under the temporary regulations—must fail.

### 2) *The final regulations*

The above discussion considered whether ILOR is a creditable tax under the temporary regulations. Because the temporary regulations only apply to the 1982 tax year, plaintiff must prove its entitlement to a refund under the final regulations for the 1983–84 tax years. For purposes of its motion for summary judgment, plaintiff does not attempt to prove that ILOR qualifies as an income tax under the final regulations. *See* Plf's Br. filed Aug. 20, 1996, at 37. Instead, plaintiff attempts to establish ILOR as a tax in lieu of an income tax.

■ As previously discussed, the temporary regulations determine whether a tax is an income tax or a tax in lieu of an income tax independently for each "separate charge." The final regulations contain a similar analytical approach, but refer to a "separate charge" as a "separate levy." *See* Treas. Reg. §§ 1.901–2(a)(1), 1.903–1(a). Treas. Reg. § 1.901–2(d)(1) provides:

For purposes of sections 901 and 903, whether a single levy or separate levies are imposed by a foreign country depends on U.S. principles and not on whether foreign law imposes the levy or levies in a single or separate statutes.... Levies are not separate merely because different rates apply to different taxpayers. For example, a foreign levy identical to the tax imposed on U.S. citizens and resident alien individuals by section 1 of the Internal Revenue Code is a single levy notwithstanding the levy has graduated rates and applies different rate schedules to unmarried individuals, married individuals who file separate returns and married individuals who file joint returns. In general, levies are not separate merely because some provisions determining the base of the levy apply, by their terms or in practice, to some, but not all, persons subject to the levy.... However, where the base of a levy is different in kind, and not merely in degree, for different classes of persons subject to the levy, the levy is considered for purposes of Section 901 and 903 to impose separate levies for such classes of persons. For example, regardless of whether they are contained in a single or separate foreign statutes, a foreign levy identical to the tax imposed by Section 871(b) of the Internal Revenue Code is a separate levy from a foreign levy identical to the tax imposed by section 1 of the Internal Revenue Code as it applies to persons other than those described in section 871(b), and foreign levies identical to the taxes imposed by sections 11, 541, 881, 882, 1491, and 3111 of the Internal Revenue Code are each separate levies, because the base of each of those levies differs in kind, and not merely in degree, from the bases of each of the others.

*See id.* § 1.903–1(a).

The base of ILOR as applied to nonresident corporations without permanent establishments is different in kind than the base of ILOR as applied to resident corporations and nonresident corporations with permanent establishments. The former base is computed using gross income, while the latter base is computed using net income. Likewise, ILOR as applied to nonresident corporations

without permanent establishments is analogous to I.R.C. § 881. *Id.* § 1.901–2(d)(1). Consequently, ILOR as applied to nonresident corporations without permanent establishments is a separate levy.

The in-lieu-of-an-income-tax provisions of the final regulations, like those of the temporary regulations. require that the separate levy is imposed in substitution for a generally imposed income tax. *Id.* § 1.903–1(b)(1). Plaintiff argues that ILOR as applied to nonresident corporations without permanent establishments is imposed in substitution for the general ILOR tax that applies to resident corporations and nonresident corporations with permanent establishments. According to plaintiff, ILOR as applied to resident corporations and nonresident corporations with permanent establishments is imposed on all income produced within Italy and therefore is an income tax otherwise generally imposed. Nonresidents without permanent establishments do not pay the general ILOR tax. Instead, such corporations pay a gross tax that is reduced by a statutory deduction.

Plaintiff's argument, while attractive, does not take into account the fact that Italy also imposes a national corporate income tax, IRPEG, on all three categories of taxpayers. Plaintiff was exempt from IRPEG by virtue of an income tax treaty between the United States and Italy. However, certain other nonresident corporations without permanent establishments paid both ILOR and IRPEG. The fact that other nonresident corporations without permanent establishments paid both ILOR and IRPEG is relevant to the analysis of Temp. Treas. Reg. § 4.903–1(b) because "[e]ach separate foreign charge will be considered either to be a tax in lieu of an income tax or not to be such a tax in its entirety for all persons subject to the charge." Temp. Treas. Reg. § 4.903–1(e)(4). Recognition of the existence of IRPEG exposes several gaps in plaintiff's proof. Plaintiff has not established that, given the operation of IRPEG, ILOR as applied to resident

and nonresident corporations with permanent establishments qualifies as an income tax otherwise generally imposed. In addition, plaintiff has failed to establish that ILOR, as applied to nonresident corporations without permanent establishments, is imposed in substitution for IRPEG. Although plaintiff argues that its payment of ILOR is in substitution for ILOR imposed on nonresident corporations with permanent establishments, this showing does not take account of IRPEG, which appears to be a generally imposed income tax. Plaintiff, as the movant, bears the burden to establish that it is entitled to judgment as a matter of fact and law under RCFC 56(c). Plaintiff cannot establish its entitlement to judgment without addressing IRPEG and its effect on the analysis required by Temp. Treas. Reg. § 1.903–1(b).[15]

### CONCLUSION

Accordingly, based on the foregoing, plaintiff's motion for partial summary judgment is granted in part and denied in part. Accordingly,

**IT IS ORDERED**, as follows:

1. Plaintiff's motion is granted as to tax year 1982, conditioned on plaintiff's proving that it falls within the I.R.C. § 904 limitation.

2. Plaintiff is entitled to judgment that ILOR is a tax for tax years 1983 and 1984 under Treas. Reg. §§ 1.901–2(a)(1)–(2), 1.901–2(e)(5)(i). Plaintiff's motion otherwise is denied, without prejudice, as to tax years 1983 and 1984.

3. The parties shall file a Joint Status Report by September 5, 1997, proposing a schedule for pretrial proceedings and trial, not to exceed 5 days, on the outstanding issues concerning the creditability of ILOR for tax years 1983 and 1984.

---

15. Plaintiff argues that Treas. Reg. § 1.901–2(b)(4)(iv), Example (5) would entitle a taxpayer to a foreign tax credit for both ILOR and IRPEG. Plf's Br. filed July 29, 1997, at 2 n. 3. While plaintiff may be correct, this example pertains to I.R.C. § 901. For purposes of the 1983–84 tax years, plaintiff has limited its proof to I.R.C. § 903. Perhaps the underlying reasoning of the example supports plaintiff's analysis under I.R.C. § 903. Plaintiff, however, has not made this showing.